UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FAY PETERSON,
    Plaintiff,

    v.

THE CONNECTICUT LIGHT
  & POWER COMPANY,
    Defendant.

No. 3:10-cv-02032 (JAM)

## MEMORANDUM OF DECISION

Plaintiff Fay Peterson is a black woman who was born and raised in Jamaica before immigrating to the United States. She is a skilled and experienced cable-splicer who used to work for defendant Connecticut Light & Power (CL&P). Nearly all of her co-workers and supervisors were white males. In late 2009, plaintiff was subject to a disciplinary suspension and then some weeks later a discharge from employment. She sued defendant under Title VII of the Civil Rights Act of 1964, alleging that she was suspended because of her race and gender and that she was fired as retaliation for complaining about discrimination.

I previously denied defendant's motion for summary judgment. *See Peterson v. Conn. Light & Power Co.*, 2014 WL 2615363 (D. Conn. 2014). The matter went to a four-day bench trial, and I now issue my findings of facts and conclusions of law. I conclude that plaintiff has fallen well short of proving that she was the subject of unlawful discrimination or retaliation.

### STATEMENT OF FACTS

The Court heard trial testimony over a period of four days from the following individuals:

- Fay Peterson, plaintiff (former cable-splicer for defendant CL&P)
- George Escobar (lead cable splicer for CL&P)
- James (Jim) Pagliaro (plaintiff's field supervisor for CL&P)

1

- Jillian Beans (plaintiff's daughter)

- Rose Banila (supervisor for metering department in CL&P)

- Adrian Bennett (overhead line worker for CL&P)

- Jade Warzenski (cable-splicer helper for CL&P)

- Ken Ciuci (chief cable splicer for CL&P)

- Susan Black (planner for CL&P)

- Joseph Picone (labor relations manager for CL&P)

- Steve Cumpston (chief cable splicer for CL&P)

- Dr. Leo Millette (physician for CL&P)

- John (Jack) Dolan (operations manager for CL&P)

Based on the testimony and documentary evidence presented at trial, the Court makes the following findings of fact.

Plaintiff Fay Peterson was born in Jamaica, where she lived until the age of 32. She moved to the United States and ultimately became a naturalized U.S. citizen. While living in the United States, she trained to become a cable splicer and worked for utility companies in the eastern United States.

In 2004, with more than 12 years of cable-splicing experience, plaintiff began working as a cable splicer for defendant in Hartford, Connecticut. She was employed to run and maintain electric cables throughout the Hartford area to provide power to businesses and residences. Cable splicers were required to handle high-voltage cable and accordingly were subject to rules designed to protect worker safety. For example, splicers were required to wear appropriate "personal protective equipment" (PPE) on each job and were required to participate in safety-oriented "tail board" meetings with their work crews before each job in the field.

While working out of the Hartford office, plaintiff had a good relationship with her co-workers and received satisfactory performance reviews. *See* Pl. Exhs. 1–4. Misfortune struck in early 2006 when an electrical transformer exploded, causing plaintiff to suffer serious injuries and burns. Plaintiff was hospitalized and on medical leave for about one year while she recovered. She filed a worker's compensation claim.

Plaintiff was transferred at her request to defendant's Stamford office in spring 2007 where she continued to work as a cable splicer in the Electric Operations department. The departmental management consisted of the operations manager, Jack Dolan, who in turn supervised Jim Pagliaro, the field supervisor. Jim Pagliaro was primarily based in the office, but occasionally observed cable splicing crews working on site in "the field." Pagliaro supervised Henry Wheeler, another lower-level supervisor who was responsible for training and overseeing the union workforce. Dolan, Pagliaro, and Wheeler were all non-union management supervisors.

CL&P's work crews of union workers had their own chain of command. At the top were the "chiefs," who assigned jobs to the workers each morning and also supervised crews of workers on the job site. Under the chiefs were the "leads," who supervised their own crews of workers on site. The cable splicers and cable-splicer helpers generally reported to the lead splicer of their crew while on a job but took assignments from the chief each morning. Although chiefs and leads had authority to direct work operations, they did not have authority to discipline workers.

The Stamford department operated with a daily routine, although each day presented different jobs. The union workers ordinarily arrived at 7 AM and gathered for a "tail board" meeting to discuss the previous day's jobs and any safety concerns that arose. Then the chief assigned jobs in the field to particular work crews. The composition of each work crew varied

daily. The work crews would divvy up trucks and get to the job site, where they would have another "tail board" meeting to discuss what was expected of them on that particular job and any safety issues to be aware of. Only then would they begin the job.

Plaintiff was the only woman among her cable splicer colleagues in Stamford, and they all initially had a good relationship. However, that relationship soon began to fray. Plaintiff testified that she did not participate in conversations about the men's personal lives, and she traced the tension in the relationship with her colleagues to a time when she told one of the lead splicers, George Escobar, that she was gay. However, her co-workers who testified cited a general change that occurred in plaintiff's attitude and behavior. Plaintiff's co-workers believed that she was disengaged and sometimes insubordinate, while plaintiff believed that their perceptions of her were colored by discrimination.

Several examples are illustrative of the conflicts that arose on the job. First, at a job at Trump Towers in Stamford, after Steve Cumpston, a chief, gave the crew specific instructions not to park at a nearby parking lot for a Target store, he discovered plaintiff sleeping in her truck during the workday while parked in the Target lot. On another occasion, plaintiff was responsible for feeding cable to Cumpston and she did not do so quickly enough because she was talking on the phone. This resulted in damage to the cable. Plaintiff's colleagues attributed her failures to her habit of talking on her personal cell phone during work hours, which regularly distracted her and delayed her from attending tail board meetings. On one occasion in 2008, Henry Wheeler was called to a job and observed plaintiff not wearing proper PPE. Nonetheless, plaintiff received a mostly positive annual review for her work in 2008, with the exception of a notation that she "needs improvement" in selecting and wearing proper PPE. Pl. Exh. 5.

As the working relationship with her colleagues deteriorated, plaintiff alleges that she began hearing negative comments targeted at her gender and Jamaican heritage. She testified that, in late 2007, she heard a colleague, Joe (Dante) Fiore (now deceased), say that he didn't want to work with her, referring to her as a "coconut head," and that she heard George Escobar and Ken Ciuci use the same term to refer to her. She also stated that Escobar put a container of grease in plaintiff's bag, which she believed he intended it as a lewd joke, though nobody ever said so specifically. She testified that she heard some men on her crew, including a colleague Steve who since passed away, telling her that the job was a man's job and not for a woman, and she heard a crew member tell her that she looked good while sweeping with a broom. *See* Def. Exh. 527.

Plaintiff was unable to identify specific dates or circumstances where and when she heard these race- and gender-based insults. She offered no notes or contemporaneous records of complaint about any of these statements from her co-workers. None of plaintiff's numerous former colleagues who testified in court recalled making or hearing any of those comments or other comments relating to plaintiff's race, national origin, or gender. Plaintiff testified that she complained to Jim Pagliaro repeatedly about the insults from her co-workers, but that he told her she was complaining too much and did not address her complaints. Pagliaro, by contrast, testified that he did not recall hearing any such complaints from plaintiff during her tenure at the company.

Having observed each of the witnesses at trial, I have considerable doubt that plaintiff was subject to the discriminatory insults that she claims. Even were I to conclude that one or more of her co-workers used race- or gender-tainted terms with her, I do not conclude that the

complaints and criticisms that her workers made about her work performance were fabricated as a result of their discriminatory animus.

A series of incidents are central to this lawsuit. On August 20, 2009, plaintiff was sent to a large job on Woodland Avenue in Stamford. The crew had to wait for another set of laborers to complete work before they could begin their job and accordingly, the splicer crew had significant "down time" during the day. During that time, plaintiff was lying down in the grass. In the late afternoon or early evening, several of her colleagues decided to take one of the trucks to a restaurant for dinner. Plaintiff's belongings, including her food from an earlier lunch run, were sitting on the truck. Her colleagues tried to find her, but she was not present. Accordingly, Jade Warzenski, one of the cable-splicer helpers, put plaintiff's belonging and her food, wrapped in packaging, on the ground near where plaintiff had been lying earlier.

Plaintiff was irate when she returned to find her belongings on the ground. After her colleagues returned to the work site, she yelled and screamed at her colleagues. She cursed at two of her co-workers (John Pelzer and Jade Warzenski) who were responsible for putting her food on the ground and accused them of treating her like a dog. Subsequently, when it was time to begin work on the job, plaintiff was working on pulling cable on a project with Pelzer. As she pulled the cable, it made contact with another cable and caused a flash, a mini-explosion. Finding that the crew was taking too long to complete the job, Pagliaro came to the work site to assess the situation. The crew continued working on that job until 6 or 7 AM the next morning, August 21, when plaintiff and the rest of the crew members were sent home for mandatory rest time.

Plaintiff reported to work again the evening of August 21, 2009. Now she was assigned to a job on Tresser Boulevard in Stamford, and the chief, Ken Ciuci, told her to head to the job immediately. However, the truck that plaintiff usually took contained Cumpston's tools and

belongings. Accordingly, plaintiff's lead, Escobar, told her to wait for Cumpston to arrive so that she could return his tools before she took the truck. Plaintiff asserts that she subsequently heard a conflicting order from Ciuci, who told her to just leave immediately. And so she did leave immediately, with Cumpston's belongings still on the truck. Cumpston arrived at the work site shortly thereafter and took his things from the truck.

Thirty minutes later, Escobar arrived at the work site and began to tell plaintiff that she had been insubordinate by heading to the work site without waiting for Cumpston. Plaintiff became irate and loudly and vehemently denied that she had been insubordinate. She began loudly yelling and cursing at Escobar. When Escobar called Ciuci to ask for help dealing with plaintiff, Ciuci could hear plaintiff yelling in the background of the phone call. Ciuci subsequently called plaintiff and told her to return to the Stamford headquarters. Some hours later, several members of management were called into a meeting with a representative from IBEW Local 420, plaintiff's union, and officially relieved plaintiff from duty pending an investigation.

An internal investigation ensued in accord with the protocol of the collective bargaining agreement (CBA) in force. A Human Relations (HR) representative, Frances St. Fleur, interviewed plaintiff as well as the other individuals involved. *See, e.g.*, Def. Exhs. 522, 523, 527. Plaintiff told St. Fleur that she believed she was being "railroaded" and targeted for discriminatory reasons. Plaintiff testified at trial that St. Fleur told her that discrimination was not the focus of the conversation. On the basis of the complaints of her co-workers, St. Fleur concluded that plaintiff had violated a series of policies by sleeping on the job, speaking on the telephone during work hours, not wearing correct PPE, and failing to defer to her supervisors and to do what she was told. *See* Def. Exh. 513.

St. Fleur communicated the results of her investigation to the labor relations department—the department with the authority to mete out discipline. After comparing the facts from the investigation with previous disciplinary actions taken against employees with similar offenses, reviewing a "disciplinary matrix" which designates a range of appropriate sanctions for specific offenses, and after a "consensus" meeting with CL&P management, including attorney Alicia Davenport, plaintiff was given a three-week unpaid suspension. *See* Def. Exh. 512. Upon plaintiff's return on September 14, 2009, the company also issued plaintiff a "final all-inclusive letter," which enumerated the policies she was found to have violated, including, among other things, "sleeping on the job." Def. Exh. 513. The letter contained a warning that "any further incidents of this nature, or any other violation of company rules, policies, or procedures will result in your immediate termination of employment." *Id.*

At the end of the suspension, plaintiff returned to work for only a few days before an ambulance was summoned to CL&P, and she was hospitalized for major depression. Subsequently, she was on medical leave for about two-and-a-half months while taking a variety of medications to treat her depression. In the midst of her leave, plaintiff filed a discrimination complaint on October 15, 2009, with the Connecticut Commission on Human Rights and Opportunities (CHRO), alleging that CL&P suspended her because of discrimination based on her race, which she identified as Jamaican, her color, her sex, and her sexual orientation. Pl. Exh. 7.

On November 30, 2009, plaintiff visited CL&P's physician, Dr. Leo Millette, for an assessment to determine whether she was ready to return to work. Plaintiff explained the medication she was taking and expressed no concern about side effects. Dr. Millette cleared her to return to her cable splicer position with certain limited restrictions. Dr. Millette discussed

8

plaintiff's return-to-work with Pagliaro and asked Pagliaro to "observe [plaintiff's] demeanor and work performance daily" as she returned to work, and to report any problems to Dr. Millette. Def. Exh. 530. Dr. Millette testified that he was concerned that plaintiff was at risk of suffering a panic attack on the job. Although he did not disclose details of plaintiff's medical condition to her supervisors, he wanted them to be aware of her behavior.

  The following day, plaintiff returned to work. But after a disruptive incident while plaintiff was at the loading dock, Jack Dolan was called to speak with her. Dolan had difficulty communicating with her, finding her to be "unresponsive," and asked if she wanted to see Dr. Millette again. Plaintiff said "yes," but the company determined that Dr. Millette was not available that day. Because plaintiff was not in a condition to drive, the company called a car service to take her home.

  Plaintiff visited Dr. Millette the next day, December 2nd, and she told him that she had taken a triple dose of her antidepressant the day before. *Id.* She had not been prescribed a triple dose, but decided to take it after she had forgotten to take her single dose the night before. Plaintiff again visited her treating physician and returned to Dr. Millette the next day, December 3rd. Dr. Millette agreed to give plaintiff permission to return to work, but this time required that she work on "light duty" rather than in her typical "safety-sensitive" cable splicer position, which Dr. Millette discussed with Dolan. *Id.* On Friday, December 4, after receiving written permission from plaintiff's treating physician for plaintiff to return to work, Dr. Millette left a detailed voicemail message updating Pagliaro that plaintiff was cleared for light-duty work, but again omitting information about plaintiff's medical condition. *Id.*

  In the meantime, on December 3, 2009, while plaintiff was consulting with physicians, CL&P attorney Alicia Davenport filed CL&P's response to plaintiff's CHRO complaint. Pl. Exh.

9

8. This response was introduced into evidence, but Davenport was not called as a witness at trial. No other supervisor witness who testified at trial—including witnesses called by plaintiff—stated that they were aware that plaintiff had filed a CHRO complaint or that defendant had filed a response.

Plaintiff returned to work at CL&P and started working light duty at a cubicle in the clerical department. On December 8, 2009, plaintiff was working in the clerical department when, shortly before lunch, another Stamford office employee, Susan Black, walked by plaintiff's cubicle and noticed plaintiff snoring with her head down on her desk. Black encountered Pagliaro on the way back to her office and told him what she had seen. Pagliaro continued towards plaintiff's cubicle and similarly saw that plaintiff was sleeping. Pagliaro summoned plaintiff into his office, and plaintiff was again relieved her from duty pending an investigation. Plaintiff testified at trial that she had not been sleeping.

A second investigation ensued, again conducted by St. Fleur, who concluded after interviewing Pagliaro, Black, and plaintiff that plaintiff had been sleeping at her desk. Again, this information was communicated to the labor relations department, followed by a consensus meeting of management, labor relations, and legal personnel, and a recommendation that plaintiff's employment be terminated in light of the "final all-inclusive" letter that she had received the previous September. *See* Def. Exh. 513.

Plaintiff's union challenged her suspension and her termination through official channels provided in the CBA. After a hearing, the arbitrator concluded there was "just cause" under the terms of the CBA for the company's suspension and termination decisions.

**DISCUSSION**

Plaintiff brings two claims under Title VII of the Civil Rights Act of 1964. First, she alleges that she received a three-week suspension from employment in August 2009 for discriminatory reasons based on her gender, black race, and Jamaican national origin. Second, she alleges that that she was terminated in December 2009 in retaliation for filing a discrimination complaint with the CHRO.

**Title VII Discrimination Claim**

To prove a Title VII claim of unlawful discrimination, an employee must prove by a preponderance of the evidence "(1) that [s]he belonged to a protected class; (2) that [s]he was qualified for [her] position . . .; (3) that [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred," at least in part, because of plaintiff's protected status (*e.g.*, her race, gender, or national origin). 42 U.S.C. § 2000e-2(a), (m); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013); *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251–52 (2d Cir. 2014); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). An employee-plaintiff must prove, with either direct or circumstantial evidence, "that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Nassar*, 133 S. Ct. at 2523; *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).

Title VII protects against status-based discrimination and is not otherwise "a general civility code for the American workplace." *Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81(1998)). An employer may take an adverse action against an employee "for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all," so long as the employer does not act for an

unlawful discriminatory reason. *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (Wisdom, J.). Moreover, "[a]n employer's good faith *belief* that an employee engaged in misconduct is a legitimate reason for terminating her, and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination." *Weisbecker v. Sayville Union Free Sch. Dist.*, 890 F. Supp. 2d 215, 238 (E.D.N.Y. 2012) (internal quotation marks and citation omitted). Even evidence that an employer acted in bad faith—if "defendant's explanation for an employment practice is 'unworthy of credence,'" for example—will not be enough to satisfy a plaintiff's burden if the plaintiff cannot ultimately prove "[t]he crucial element," which is "discrimination, not dishonesty." *Desert Palace*, 539 U.S. at 100 (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147 (2000)); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 155–156 & 155 n.5 (2d Cir. 2010); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 514–15 (1993). Therefore, a discrimination claim may require more than just evidence that an employee was treated differently from her co-workers— it requires proof that the differential treatment was motivated by plaintiff's protected status. *Nassar*, 133 S. Ct. at 2525 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

    Here, plaintiff concedes that none of the supervisory/management individuals who made the decision to suspend her had any discriminatory animus towards her. Instead, she claims discriminatory animus by her co-workers and that this animus led to false reports of her misconduct that in turn led to the decision of management to suspend her. I need not decide whether this conduct, if proven, would legally suffice to hold defendant liable for discrimination. *See Peterson*, 2014 WL 2615363 at *3–*4 & n.1 (summary judgment ruling describing potential "cat's paw" theory of liability). That is because I conclude that plaintiff has failed in the first

instance to prove discriminatory animus by her co-workers, much less that their reports of her misconduct were false for reasons of discriminatory animus.

All of plaintiff's co-workers testified credibly and consistently that they had not insulted plaintiff on the basis of her race, national origin, or gender, that they had not heard any of their colleagues do so, and that they did not harbor discriminatory animus against plaintiff. By contrast, plaintiff's testimony about discriminatory insults and comments was vague as to dates, as to who made them, and as to how they contributed to the allegedly false allegations of misconduct made against her.

Nor was there any corroborating evidence to support plaintiff's claim that she was subject to discriminatory insults. For example, she did not file any written complaints at any time prior to the incidents of August 2009 that led to her suspension. She did not call the so-called "Beacon Line" set up by the company to report abuse. Even her CHRO complaint of October 2009 lacked specifics about insults or abuse. I do not rule out the possibility that plaintiff may have been subject at times to abusive comments even if inappropriately meant in jest, but what I can say is that plaintiff did not come close to proving by a preponderance of the evidence that she actually was subject to such abuse.

Plaintiff's co-workers also testified credibly and consistently about plaintiff's repeated incidents of workplace misconduct. Many testified that plaintiff tended to be distracted by personal telephone calls, which led her to miss hearing important safety information during "tail board" meetings. In addition, both Escobar and Cumpston testified that they encountered plaintiff inappropriately sleeping during work time. Plaintiff also validated Escobar's report to St. Fleur that "[t]here are . . . issues with [plaintiff] wearing her PPE (Personal Protective

13

Equipment)," Def. Exh. 522, when plaintiff testified that on at least one occasion, her supervisor Henry Wheeler encountered her in a manhole not wearing the proper safety glasses.

Perhaps most significantly, plaintiff's co-workers also testified that plaintiff's temper led to workplace disruptions and caused unsafe conditions on job sites. In her own testimony, plaintiff conceded that she overreacted to the incident on August 20, 2009, when her co-worker Jade Warzinski placed her food on the ground, and that she continued yelling even after Warzinski apologized.

My task is not to decide if defendant had good reasons for suspending plaintiff from her job. I need only conclude—and do conclude—that plaintiff failed to prove by a preponderance of the evidence either that her co-workers' complaints about her conduct were false or that the complaints were maliciously made for discrimination-based reasons (as opposed to simply not liking her or finding her difficult to work with). Because she has not met this standard and because she otherwise concedes that no management personnel were motivated by discriminatory animus, her Title VII discrimination claim must fail.

**Title VII Retaliation Claim**

Plaintiff further contends that she was fired from her job in December 2009 in retaliation for her filing of a CHRO complaint in October 2009. Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. 42 U.S.C. § 2000e–3(a); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). To prove that she was the victim of retaliation in violation of Title VII, a plaintiff must show "that [s]he engaged in a protected activity, such as complaining about race discrimination, and that [her] employer took

an adverse action in retaliation." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). Moreover, she must prove that the employer would not have acted "but for" the plaintiff's protected activity. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision" (quoting *Nassar*, 133 S. Ct. at 2526)). In the context of a retaliation claim, as with a standard discrimination claim, merely disproving an employer's proffered reason for acting may not provide sufficient proof of causation without additional evidence of a retaliatory motive. *See Reeves*, 530 U.S. at 146 ("the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not *compel* judgment for the plaintiff"); *Tsaganea v. City Univ. of New York, Baruch Coll.*, 441 F. App'x 12, 15 (2d Cir. 2011) ("[I]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of [retaliation]." (internal quotation marks and citation omitted)).

Plaintiff offered no direct evidence that she was fired for retaliatory reasons. For example, she did not point to any statements by any of her co-workers, supervisors, or management about their intent to get even with her for claiming discrimination. Plaintiff's retaliation case rests almost entirely on an inference to be drawn from the proximity between the date that she filed her CHRO complaint (October 15, 2009), the date that attorney Alicia Davenport filed a response to the CHRO complaint (December 3, 2009), the date that she was accused of sleeping while working in the clerical department (December 8, 2009), and the date that she was fired (December 18, 2009). But this evidence of temporal proximity, without more, is not enough to establish discriminatory retaliation. *See Abrams*, at 254–55 (citing *El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010)).

And there is not much more here. Plaintiff's evidence challenging defendant's proffered legitimate reason for terminating her—the fact that plaintiff was sleeping at her desk after receiving the "all-inclusive warning"—does not suffice to discredit defendant's account. Defendant amply demonstrated on the basis of consistent testimony from both Pagliaro and Black that plaintiff was asleep on the job. Plaintiff contends that if that were so, her supervisors should have consulted with Dr. Millette, based on Dr. Millette's instructions to Pagliaro. *See* Def. Exh. 530. But even if I accept this as true, her supervisors' failure to contact Dr. Millette would show their negligence at most, not that they acted to retaliate against plaintiff for engaging in Title VII protected activity. In fact, there is no evidence on record that Pagliaro was aware of plaintiff's CHRO complaint at the time.

Plaintiff also identifies as evidence of discrimination the fact that Dolan did not discuss plaintiff's light duty assignment during the December 2009 consensus meeting. I conclude that such omission, if true, had no bearing on the consensus decision to recommend plaintiff's termination. Picone testified that the consensus committee was aware of plaintiff's light duty assignment. Moreover, there is no evidence that Dolan or any other members of company management knew or had reason to know about plaintiff's medical condition, or that such knowledge would have changed their decision. They had a right to expect that plaintiff—like any other CL&P employee—would not sleep on the job. Indeed, the fact that plaintiff has not identified any discriminatory animus by any CL&P supervisor or HR decision-maker is an additional reason to discount as implausible plaintiff's claim that her termination was for retaliatory reasons. I conclude that plaintiff has not refuted defendant's contention that, when plaintiff was found sleeping on the job after she received a prior warning letter reprimanding her in part for the same offense, she was fired for that reason and that reason alone.

**CONCLUSION**

Plaintiff has an admirable record of skills and service in a very demanding and dangerous work environment. Nevertheless, I conclude that plaintiff has not satisfied her burden to prove by a preponderance of the evidence that her suspension from employment was motivated in whole or in part by discrimination based on her gender, race, or Jamaican origin. She has further failed to prove that she would not have been terminated in December 2009 absent defendant's desire to retaliate against her for filing a discrimination complaint with the CHRO. Accordingly, judgment shall enter for defendant on all counts.

It is so ordered.

Dated at Bridgeport this 15th day of December 2014.

/s/
Jeffrey Alker Meyer
United States District Judge